IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| Plaintiff, | § § | |
| vs. | § § | NO. 23-CR-00066-RB |
| DELBERT TYLER TREVINO | § § § | |
| Defendant. | § § | |

**Motion to Dismiss the Indictment Under the Second Amendment**

The Supreme Court's recent opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), upended Second Amendment law. Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts, instead, to consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under Bruen "the Constitution presumptively protects that conduct." *Id*. at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id*. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted.

Under the new framework mandated by *Bruen*, the Court should dismiss the three-count superseding indictment against Delbert Trevino, which charges him with possessing a firearm not registered with the national firearms, registration, and transfer records, in violation of 26

U.S.C. § 5861(d); illegal receipt of a firearm by a person under indictment, in violation of 18 U.S.C. § 922(n); illegal receipt of ammunition by a person under indictment, in violation of 18 U.S.C. § 922(n). Because Mr. Trevino's possession (received) of a firearm comes within the Second Amendment's "plain text," his conduct is presumptively protected. And the government will be unable to rebut that presumption, as laws disarming felony indictees were unknown to the generation that ratified the Second Amendment. This Court should join the multiple courts to hold, in light of *Bruen*, that § 922(n) violates the Second Amendment, and should therefore dismiss the indictment. See *United States v. Quiroz*, No. PE:22-CR-00104-DC, --- F. Supp. 3d ---, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022); *United States v. Stambaugh*, No. CR-22-00218-PRW-2, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022).

**I. Procedural History**

In October 2020, Mr. Trevino was arrested and later charged by indictment (on November 12, 2020) with theft of property greater than or equal to $30,000 but less than $150,000; fraudulently use or posses identifying information of another person, and possession of a controlled substance. On, January 19, 2021, Mr. Trevino entered a deferred adjudication. In June, 2021, while on deferred adjudication, Mr. Trevino received the firearms in the current superseding indictment from the El Paso Police Department.

On September 2, 2022, during the search of a residence that Mr. Trevino was housesitting, 2 firearms and ammunition (in the superseding indictment) were located. Mr. Trevino was subsequently arrested and indicted and superseding in an indictment on June 21, 2023 which charges him with possessing a firearm not registered with the national firearms, registration, and transfer records, in violation of 26 U.S.C. § 5861(d); illegal receipt of a firearm

by a person under indictment, in violation of 18 U.S.C. § 922(n); illegal receipt of ammunition by a person under indictment, in violation of 18 U.S.C. § 922(n).

## II. Legal Background

### A. Before *Bruen*, lower courts assessed Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592, 624 (2008). The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, law and practice in the colonial and early-republic periods, and evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary). Id. at 592-619. Based on this survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." Id. at 586. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." Id. at 581, 622. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. Id. at 628-34.

Two years after Heller, in McDonald v. City of Chicago, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." 561 U.S. 742, 767 (2010). And that right, the Court warned,

should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." Id. at 780.

Following Heller and McDonald, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. See Bruen, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." United States v. Chapman, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. Id. But if the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate form of means-end scrutiny." Id. Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in Heller—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." Id. at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. Id. Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. See United States v. Hosford, 843 F.3d 161, 168 (4th Cir. 2016).

**B. Bruen replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."**

The Supreme Court's recent opinion in Bruen disavowed the lower courts' framework, holding that "Heller and McDonald do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with Heller's methodology. Id. at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." Id. at 2126. If it does, then "the Constitution presumptively protects that conduct." Id. Answering this preliminary question in Bruen was straightforward. At

issue there was a New York law providing that, to obtain a permit to carry a concealed handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." Id. at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protect[ed] [the petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." Id. at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." Id. The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement, which infringed that right, could pass constitutional muster only if the state overcame the presumption. Id. at 2129-30, 2135.

To rebut the presumption of unconstitutionality, Bruen held, "the government may not simply posit that [a] regulation promotes an important interest." Id. at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." Id. This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." Id. at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. Id. at 2132.

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." Id. at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. Id. at 2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should

do so with care. Id. at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." Id. at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." Id.

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." Id. Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." Id. But the farther forward in time one goes from 1791, the less probative historical evidence becomes. See id. at 2137 ("As we recognized in Heller itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." Id. Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but should otherwise afford it little weight. Id. After all, "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." Id. (emphasis in original); see also id. at 2154 n.28 (ignoring "20th-century historical evidence" entirely because it is too far removed from 1791).

The Court in Bruen held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. Id. at 2138-56. In reaching that conclusion, the Court did not elaborate a

comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow.

> **1. Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" challenges.**

To begin, the Court explained that the standard for reviewing historical evidence differs depending on what kind of problem a statute is intended to remedy—specifically, whether that problem is old or new. In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." Id. at 2131. The government can defend such statutes only by identifying a tradition of "distinctly similar" regulations from the founding era. Id. If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional today. Id.

In "other cases," a challenged statute will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." Id. at 2132. Historical inquiry into these statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." Id. Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." Id. The Court in Bruen declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is

comparably justified [i.e., the 'why'] are central considerations when engaging in an analogical inquiry." Id. at 2133 (emphasis omitted).

This latter approach to Bruen's historical inquiry—which the Court called "analogical reasoning," id. at 2132—is less difficult for the government to satisfy. But, critically, courts may employ that approach only when the challenged statute is geared toward a societal problem that was "unimaginable at the founding." Id. It is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." Id. at 2131. At the threshold, therefore, courts faced with a Bruen challenge must identify the problem at which a statute is aimed, and then determine whether it existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. Id. at 2132.

### 2. The government must identify a "well-established and representative" tradition of comparable regulations.

Whether based on "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. To carry its burden, the government must show that the historical tradition on which it relies is "well-established and representative." Id. at 2133; see also id. at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" if that practice "has been open, widespread, and unchallenged since the early days of the Republic").

A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" do not make out a historical tradition. Id. at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition. Id. at 2142. And in evaluating 19th-century "surety laws" that New York argued were precursors to its "proper cause" requirement, the Court discounted two of

those ten laws—which were most similar to New York's—as unrepresentative. See id. at 2148 n.24. Moreover, even if certain statutes were widespread in the founding era, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. See id. at 2149 (dismissing surety laws, in part, because "respondents offer little evidence that authorities ever enforced [those] laws").

> 3. **The government bears the burden of demonstrating that a statute is consistent with the Nation's historical tradition.**

Finally, Bruen emphasized—repeatedly—that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." Id. at 2135. The "[g]overnment bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 2127, 2130. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." Id. at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." Id. at 2150.

And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." Id. at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. See also id. at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

**III. Argument**

Under the framework announced in Bruen, § 922(n) on its face violates Mr. Trevino's Second Amendment right to keep and bear arms; possession (receipt) of a firearm. Receiving a firearm(s) (previously owned/maintaining possession) qualifies as "keep[ing]" arms under the amendment's "plain text," and that text does not differentiate between felony indictees and other members of "the people." Accordingly, a total prohibition on receiving firearms by those under felony indictment presumptively violates the Second Amendment. The government will be unable to rebut that presumption. Mr. Trevino's research has not revealed any pre-20th-century laws disarming those under felony indictment. Thus, there was no "historical tradition," as of 1791, of barring felony indictees from possessing firearms, and more recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed when the Second Amendment was enacted. And even if § 922(n) is facially valid, its application to Mr. Trevino is unconstitutional, as neither his background nor the conduct alleged in his underlying felony case suggests he is violent or lacking in virtue.

**A. Section 922(n) is facially unconstitutional under the Second Amendment.**

  **1.  The Second Amendment's "plain text" protects Mr. Trevino's possession (receipt) of a firearm and ammunition.**

Bruen directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The answer to that question is not difficult in Mr. Trevino's case. The Second Amendment's operative clause contains three textual elements:

it protects the right of (1) "the people" to (2) "keep and bear" (3) "Arms." Here, Mr. Trevino satisfies all three elements.

The superseding indictment charges Mr. Trevino with possessing a firearm not registered with the national firearms, registration, and transfer records, illegal receipt of a firearm by a person under indictment, and illegal receipt of ammunition by a person under indictment. According to Heller, handguns are "the quintessential self-defense weapon," an item that falls comfortably withing the meaning of "Arms" for Second Amendment purposes. 554 U.S. at 629. Heller defined "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession"—in short, to "have weapons." Id. at 582 (citing founding-era dictionaries).

Finally, Mr. Trevino is part of "the people" within the meaning of the Second Amendment. Just as that amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," Bruen, 142 S. Ct. at 2134, it does not draw a distinction between people who are, and are not, under felony indictment. "Nothing in the Second Amendment's text" suggests that those who have been indicted for a felony are unentitled to the amendment's protection. Id.

Heller confirms this conclusion. Construing the words "the people" in that case, the Court said "the term unambiguously refers to all members of the political community, not an unspecified subset." Heller, 554 U.S. at 580 (emphasis added). It interpreted "the people" to refer to all "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." Id. Thus the Second Amendment right "is exercised individually and belongs to all Americans." Id. at 581 (emphasis added). Interpreting "the people" to exclude felony indictees would conflict with that principle.

In addition, Heller explained that "the people" is a "term of art" that bears a uniform meaning across a number of constitutional provisions, namely, the First, Second, Fourth, and Ninth Amendments. Id. at 580. The result is that, if a felony indictment deprives someone of his Second Amendment right to bear arms, it would also deprive him of his First Amendment rights to speak about matters of public concern and worship according to his faith, and his Fourth Amendment right to be free from warrantless searches of his home. That cannot be right. See, e.g., United States v. Perez-Gallan, No. PE:22-CR-00427-DC, 2022 WL 16858516, at *9 (W.D. Tex. Nov. 10, 2022) (striking down 18 U.S.C. § 922(g)(8), which bars firearm possession by people subject to intimate-partner restraining orders, and explaining that because such people "may invoke the protections of [the First and Fourth Amendments]," they may also invoke the protections of the Second); United States v. Meza-Rodriguez, 798 F.3d 664, 670-71 (7th Cir. 2015) (concluding "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore extends to all "persons who are part of a national community").

Notwithstanding this straightforward interpretation of the Second Amendment's "plain text," the government has argued in other post-Bruen litigation that "the people" includes only law-abiding citizens. See, e.g., United States v. Riddick, No. 8:22-cr-57-TDC, ECF No. 55 at 4 (D. Md. Aug. 30, 2022). This argument derives from a comment the Heller Court made when determining the proper standard of review for Second Amendment claims. In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the Heller majority explained that the Second Amendment "is the very product of an interest balancing *by the people*." 554 U.S. at 634-35 (emphasis in original). The result is that judges lack authority to "conduct [that balancing] anew" or "decide on a case-by-case basis whether the right is really worth insisting

upon." Id. (emphasis in original). And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 635. Based on this latter sentence, the government has argued elsewhere that only "law-abiding, responsible citizens" enjoy the right to keep and bear arms. See, e.g., Riddick, No. 8:22-cr-57-TDC, ECF No. 55 at 4.

This argument plainly misreads Heller. By beginning the quoted passage with "whatever else it leaves to future evaluation," the Heller Court made clear that its reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling. The Court, in other words, held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether—much less rule out the conclusion that—other people have that right, too. Indeed, the Court expressly left that question "to future evaluation." As one court has put it, Heller "conclusively established [that] the Second Amendment applies to law-abiding and peaceable citizens at the very least." Stimmel v. Sessions, 879 F.3d 198, 204-05 (6th Cir. 2018) (emphasis added). That is, Heller's "law-abiding" language does not "demarcate [the Second Amendment's] outer limit" or "exclude[]" anyone from the amendment's coverage, id.; it merely makes clear that certain people do fall within the amendment's reach. See Perez-Gallan, 2022 WL 16858516, at *8 (explaining that Heller "defined 'the people' as 'members of the political community,' not 'law-abiding, responsible citizens'"); United States v. Jimenez-Shilon, 34 F.4th 1042, 1046 (11th Cir. 2022) (concluding that even "dangerous felons" "are indisputably part of 'the people'" for Second Amendment purposes, notwithstanding their past violations of the law).

Heller's qualifying language is clear, but to the extent it was ambiguous, Bruen dispelled the ambiguity. The passage cited above references law-abiding, responsible citizens' right to use

arms "in defense of hearth and home." Id. If that passage were meant to mark off the outer edges of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms outside the home. But Bruen held the Second Amendment right does extend outside the home, 142 S. Ct. at 2134, and the Court in Bruen gave no hint that it believed it was contradicting Heller in that regard. Thus Bruen confirms that it would be a mistake to read Heller's "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

In other cases, the government has argued Bruen supports its view that only law-abiding citizens enjoy Second Amendment protection. E.g., Riddick, No. 8:22-cr-57-TDC, ECF No. 55 at 4-5. It does so by noting that at several points, Bruen describes its holding by using the term "law-abiding." See, e.g., 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the [Second] Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). But Bruen repeated the "law-abiding" appellation because the petitioners in that case alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted certiorari to decide only whether "New York's denial of petitioners' license applications violated the Constitution." Id. at 2124-25 (emphasis added). No other questions were before the Court in Bruen, and at no point did the Court say Second Amendment rights are limited to law-abiding citizens.

Indeed, Bruen reaffirmed Heller's conclusion that the Second Amendment right belongs to "'all Americans.'" Id. at 2156 (emphasis added) (quoting Heller, 554 U.S. at 581). That statement cannot be reconciled with the government's view that Bruen (implicitly) limits the arms right to law-abiding citizens. And Bruen repeated Heller's instruction that courts should give "the Second Amendment's language" its "'normal and ordinary' meaning." Id. at 2127 (quoting Heller, 554 U.S. at 576). There is nothing normal or ordinary about reading "the

people" to mean "law-abiding people."

In any event, even if the "the people" excludes the non-law-abiding, that fact has no bearing on a challenge to § 922(n). "A person under indictment is presumed innocent and, until conviction, is not guilty of the charge that triggers the application of § 922(n)." United States v. Call, 874 F. Supp. 2d 969, 977 (D. Nev. 2012); see also United States v. Love, No. 20-20327, 2021 WL 5758940, at *3 (E.D. Mich. Dec. 3, 2021) ("And the fact of the underlying indictment does not make [a § 922(n) defendant] a criminal. *Individuals charged with crimes are entitled to have their guilt or innocence determined based on evidence presented at trial, not on the grounds of suspicion, indictment, continued custody or other circumstances not adduced as proof at trial.*" (emphasis in original)).

The presumption of innocence is both a moral and practical imperative. A "grand jury investigation is not an adversarial process"; the Supreme Court has held that "(1) the rules of evidence don't apply, (2) evidence barred by the Fourth Amendment's exclusionary rule may be heard, and (3) the grand jury may rely on evidence obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." United States v. Quiroz, No. PE:22-CR-00104-DC, --- F. Supp. 3d ---, 2022 WL 4352482, at *10 (W.D. Tex. Sept. 19, 2022) (holding § 922(n) violates the Second Amendment) (citations omitted). At the time of indictment, a defendant "has not seen the evidence against him, or had the other protections of due process, including an opportunity to present his own version of events." United States v. Laurent, 861 F. Supp. 2d 71, 80 (E.D.N.Y. 2011); see also Stambaugh, 2022 WL 16936043, *5 (observing, in course of striking down § 922(n) under Second Amendment, that "the accused are entitled to neither notice of, nor an opportunity to be heard at, grand jury proceedings, so the accused never has a chance to contest their Second Amendment-rights-depriving status as an indictee"). The

grand jury, moreover, "need not consider . . . exculpatory evidence." Laurent, 861 F. Supp. 2d at 88. As a result, the "great power and discretion vested in the grand jury . . . brings with it the potential for mistake and abuse." Id. at 89. Some commentators have even "criticize[d] the modern grand jury as no more than a 'rubber stamp' for the prosecutor," which "would indict a ham sandwich if asked to do so." Id. at 89-90.

Worse, some § 922(n) defendants do not receive even the minimal procedural protections of the grand jury before being indicted for an underlying felony. The "right to a grand jury indictment is not always applicable to state court proceedings," Quiroz, 2022 WL 4352482, at *11, and a defendant may be liable under § 922(n) even where his underlying felony was charged by "information," see 18 U.S.C. § 921(a)(14). The result is that "a defendant indicted for a state felony could lose the right to buy a firearm [under § 922(n)] without the case ever reaching a grand jury." Quiroz, 2022 WL 4352482, at *11 . For these reasons, courts have concluded that "for purposes of construing [§ 922(n)], a defendant under indictment is a 'law-abiding citizen' who remains eligible for Second Amendment protections." Laurent, 861 F. Supp. 2d at 102 (quoting Heller); see also Call, 874 F. Supp. 2d at 977 (same); Stambaugh, 2022 WL 16936043, *2 ("[C]ategorically deeming those indicted for felonies 'non-lawabiding and dangerous'—as the United States urges—is at odds not only with the presumption of innocence, but also with our system of pre-trial detention, where judges are tasked with making individualized determinations of dangerousness. Therefore, as a person who is presumed to be a law-abiding citizen until proven otherwise at trial, Stambaugh remains part of 'the people' whom the Second Amendment protects.").

Mr. Trevino, an American citizen, is part of the United States' "national community." Heller, 554 U.S. at 580. He is therefore among "the people" protected by the Second

Amendment.

## 2. The government will be unable to show that § 922(n) is consistent with the United States' "historical tradition of firearm regulation."

Because "the Second Amendment's plain text covers [Mr. Trevino's] conduct, the Constitution presumptively protects that conduct." Bruen, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that § 922(n) "is consistent with this Nation's historical tradition of firearm regulation." Id. The government will be unable to do so.

As explained above, the threshold question in Bruen's historical inquiry is whether the problem addressed by § 922(n) is longstanding or of more recent provenance. The answer is clear: courts have been releasing felony indictees on bail since before the founding. See, e.g., Matthew J. Hegreness, America's Fundamental and Vanishing Right to Bail, 55 Ariz. L. Rev. 909, 912 (2013) ("In state constitutions, from the Founding through the Nixon era, the right to bail was automatic and inalienable for all crimes not punishable by death. Even persons accused of capital crimes were entitled to bail as a matter of constitutional right unless the evidence of their guilt was great."); Donald B. Verrilli, Jr., The Eighth Amendment and the Right to Bail: Historical Perspectives, 82 Colum. L. Rev. 328, 337 (1982) ("Right to bail provisions existed in several colonial charters, indicating a widespread belief in a right to bail."); Stack v. Boyle, 342 U.S. 1, 4 (1951) ("From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present[,] . . . federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail."). Thus the "general societal problem" at which § 922(n) is directed—i.e., felony indictees' access to guns—"has persisted since the 18th century." Bruen, 142 S. Ct. at 2131; see Stambaugh, 2022 WL 16936043, *5 ("[T]he alleged societal problem addressed by §

922(n)—persons under indictment receiving firearms—has existed for the entirety of our Nation's existence.").

As a result, § 922(n) is unconstitutional unless the government shows a robust tradition of "distinctly similar" historical regulations as of 1791, when the Second Amendment was ratified. Bruen, 142 S. Ct. at 2131. The government cannot defend § 922(n) through "analogical reasoning," which is reserved for statutes aimed at "unprecedented" problems that would have been "unimaginable" at the founding. Id. at 2132. After all, the potential danger posed by felony indictees' access to firearms would hardly have been foreign to the Founders.

The government will be unable to carry its burden. What is today § 922(n) traces its roots to the Federal Firearms Act of 1938. Laurent, 861 F. Supp. 2d at 82 (citing 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251). Under that statute, "individuals under indictment for, or convicted of, a crime of violence" were prohibited from shipping or transporting firearms or ammunition. Id. In 1961, Congress "expanded" the statute to cover anyone indicted for a "'crime punishable by imprisonment for a term exceeding one year,'" whether "violent" or not. Id. at 93 (quoting Act of Oct. 3, 1961,

Pub. L. No. 87–342, § 2, 75 Stat. 757). Section 922(n), therefore, is a creature of the 20th century. The Court in Bruen, however, said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their amici," since evidence of that type "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." 142 S. Ct. at 2154 n.28. A regulation of such recent vintage cannot establish a historical tradition unless they "confirm" earlier practice. Id. at 2137.

Here, it does not. Mr. Trevino has been unable to locate any 18th- or 19th-century statutes that, like § 922(n), disarmed felony indictees. In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Churchill concluded, based on that survey, that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Id. at 142. And Mr. Trevino's own examination of historical sources has revealed no statutes disarming felony indictees before the 20th century. See Laurent, 861 F. Supp. 2d at 82 (describing indictee-disarmament laws as "of comparatively recent vintage").

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(n). Bruen, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(n) to "confront" the "perceived societal problem" posed by felony indictees' access to guns. Id. at 2131. But they declined to do so, and that inaction indicates § 922(n) "[i]s unconstitutional." Id.

## IV.     Conclusion

Section 922(n) and section 5861(d) violates the Second Amendment as it was understood at the time of its adoption, both facially and as applied to Mr. Trevino. The Court should therefore dismiss the indictment.

        Respectfully submitted,

        DAMIAN RASMUSSEN, ATTORNEY AT LAW
4621 PERSHING DR.
EL PASO, TEXAS 79903
TELEPHONE: (915) 400-7785
EMAIL: damian@damianrasmussenlaw.com

By:    S/Damian Rasmussen_____
Damian Rasmussen
Texas Bar No. 24110952
Law Offices of Damian Rasmussen
4621 Pershing Dr.
El Paso, Texas 79903
Telephone: 915.400.7785
Email: damian@damianrasmussenlaw.com

## **CERTIFICATE OF SERVICE**

    I, Damian Rasmussen, do certify that on September 9, 2023, I caused the instant motion to be filed with the Clerk of the Court using the CM/ECF system that will serve all other parties entitled to service and notice.

        /s/*Damian Rasmussen*
        Damian Rasmussen