**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                       No. CR 2:23-cr-00066 RB

DELBERT TYLER TREVINO,

      Defendant.

### MEMORANDUM OPINION AND ORDER

In 1961, Congress banned persons "under indictment for a crime punishable by imprisonment for a term exceeding one year" from receiving firearms or ammunition that have traveled in interstate commerce. 18 U.S.C. § 922(n). On June 21, 2023, the United States filed a superseding indictment charging Defendant Delbert Tyler Trevino, who was under indictment for purposes of the statute, with two counts of receiving firearms and ammunition pursuant to § 922(n). Trevino moves to the dismiss the superseding indictment on the basis that § 922(n) is unconstitutional under the framework instituted by the United States Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 F. Ct. 2111 (2022). (Doc. 51.)

Having examined § 922(n) under the *Bruen* standard, the Court finds that while Trevino may be part of the class of citizens whom the Second Amendment covers, the Government meets its burden to show that § 922(n) is consistent with our country's historical tradition of firearms regulation and, therefore, does not violate the Second Amendment. The Court **DENIES** Trevino's motion to dismiss.

## I.    Procedural History[1]

On November 12, 2020, Trevino was indicted in a Texas state court on three counts: theft of property; fraud; and possession of a controlled substance. (*See* Doc. 55-1.) On January 19, 2022, Trevino pleaded guilty, and the court entered an Order of Deferred Adjudication on the three felony charges. (*See* Doc. 55-2.) "In Texas, deferred adjudication permits a defendant to accept responsibility for a crime without an actual conviction." (Doc. 55 at 2.) "If a defendant successfully completes the terms and conditions of 'community supervision' (*i.e.*, probation), then the defendant's case [is] dismissed" without the blight of a felony conviction on their record. (*See id.*)

According to the Order of Deferred Adjudication, Trevino was not allowed to "possess or transport any type of firearm, prohibited weapon, or body armor." (*See* Doc. 55-2 at 8.) Thus, the El Paso Police Department (EPPD) seized Trevino's firearms. (*See* Doc. 55 at 2.) On June 6, 2022, while he was still on deferred adjudication, Trevino went to "the EPPD and demanded the return of his firearms on the basis that he was not a convicted felon." (*Id.* at 2–3.) The EPPD returned the firearms to Trevino. (*See id.* at 3.)

The Government asserts that on July 22, 2022, Trevino "purchased, and thus received," ammunition from a store in Las Cruces, New Mexico. (*Id.*) "On September 2, 2022, in connection with a homicide investigation," authorities executed search warrants on Trevino's residence and vehicle. (*See id.*) Officers recovered the firearms Trevino received from the EPPD and the ammunition he purchased in Las Cruces. (*Id.*) Consequently, the United States charged Trevino with, *inter alia*,[2] illegal receipt of firearms and of ammunition by a person under indictment in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D). (Doc. 39.) Trevino now moves to dismiss the

[1] The Court recounts the factual history as presented in the Government's response brief. (Doc. 55 at 2–3.) Trevino did not file a reply brief.
[2] Trevino has also been charged with possessing a firearm not registered with the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. (Doc. 39.)

charges on the basis that § 922(n) violates the Second Amendment. (Doc. 51.)

## II.     Legal Standards

Federal Rule of Criminal Procedure 12(b)(1) allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." The Court may entertain a motion to dismiss under Rule 12(b)(1) "that require[s] it to answer only pure questions of law." *See United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010) (citations omitted). Trevino's constitutional challenge is appropriately raised in a motion to dismiss because the Court may decide the question without considering any issues of fact. *See id.*

Trevino summarily asserts that § 922(n) is invalid both facially and as applied to him. (*See* Doc. 51 at 10, 19.) A facial challenge requires "the challenger [to] establish that no set of circumstances exists under which the [law] would be valid." *See United States v. Salerno*, 481 U.S. 739, 745 (1987). "In contrast, an as-applied challenge may concede that the statute is generally constitutional in most of its applications, but asserts that the statute is unconstitutional under the particular case's circumstances." *United States v. Streett*, 434 F. Supp. 3d 1125, 1149 n.15 (D.N.M. 2020), *aff'd*, 83 F.4th 842 (10th Cir. 2023) (citation omitted).

## III.     Analysis

### A.     The relevant legal landscape.

At issue here is the constitutionality of 18 U.S.C. § 922(n), which makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm or ammunition which has been shipped or transported in

interstate or foreign commerce."[3] Trevino argues that, given the new standard announced in *Bruen*, § 922(n) violates the Second Amendment. (Doc. 51.)

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court affirmed "that 'the people,' not just members of the 'militia,' have the right to use a firearm to defend themselves." *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (discussing the "key point" of *Heller*). Specifically, the *Heller* court opined that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. In *McDonald v. Chicago*, 561 U.S. 742, 750 (2010), the Supreme Court held that the same Second Amendment right applies to the States. Following *Heller* and *McDonald*, courts employed "a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *See Bruen*, 142 S. Ct. at 2125; *see also, e.g.*, *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010), *abrogated by Bruen*, 142 S. Ct. 2111 (employing the "two-pronged approach to Second Amendment challenges") (citations omitted). That approach required courts to first "ask[] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee." *See Reese*, 627 F.3d at 800 (quotation omitted). "If the government [could] prove that the regulated conduct [fell] beyond the Amendment's original scope, then" the regulation was constitutional. *See Bruen*, 142 S. Ct. at 2126 (citation omitted). If the conduct fell within the scope of the Second Amendment, courts applied means-end scrutiny to determine whether the regulation was constitutional. *See id.*

---

[3] Trevino does not dispute that § 922(n) applies to him. (*See* Doc. 51.) Indeed, Tenth Circuit authority provides that "an offender subject to conditional discharge is still under indictment until the condition is met–completion of the term of probation." *United States v. Saiz*, 797 F.3d 853, 854 (10th Cir. 2015).

In *Bruen*, the Court held as violative of the Second Amendment a New York law that conditioned issuance of a concealed-carry permit on an individual's showing of a "special need for self-defense . . . ." *See id.* at 2122. The Supreme Court decided the two-step framework and means-end scrutiny test that arose post-*Heller* was "one step too many." *See id.* at 2127. The Court held that the first step, "which demands a test rooted in the Second Amendment's text, as informed by history[,]" is still acceptable. *See id.* At the newly adopted second step, however, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

Although *Bruen* expanded our understanding of citizens' Second Amendment rights to include the right to possess firearms outside one's home, the majority seemingly took care not to disturb other "restrictions that may be imposed on the possession or carrying of guns." *See id.* at 2157 (Alito, J., concurring). For example, the Tenth Circuit recently observed that *Bruen* "didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons." *Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023). The *Vincent* court pointed out that "*Bruen* apparently approved the constitutionality of regulations requiring criminal background checks before applicants could get gun permits[,]" as the *Bruen* Court observed that firearms "'applicants [must often] undergo a background check' to ensure that the applicant is a 'law-abiding, responsible citizen[].'" *Id.* at 1201–02 (quoting *Bruen*, 142 S. Ct. at 2138 n.9).

It is against this backdrop that the Court examines Trevino's challenge to § 922(n). Trevino asserts that his conduct—receipt of firearms—is covered by the plain text of the Second Amendment. (Doc. 51 at 10.) He further argues that the United States cannot establish that § 922(n) is consistent with our "Nation's historical tradition of firearm regulation." (*Id.* at 17 (quoting *Bruen*, 142 S. Ct. at 2126).)

As outlined below, the Court answers the first question in the affirmative: the plain text of the Second Amendment covers Trevino's conduct. Turning to the second question, the Court holds the Government meets its burden to demonstrate that the statute is consistent with historical analogues. Consequently, the Court declines to find that § 922(n) violates the Second Amendment. In reaching this conclusion, the Court joins the substantial majority of courts that have, since *Bruen*, found § 922(n) withstands constitutional scrutiny. *See, e.g.*, *United States v. Posada*, --- F. Supp. 3d ---, 2023 WL 3027877 (W.D. Tex. Apr. 20, 2023); *United States v. Jackson*, --- F. Supp. 3d ---, 2023 WL 2499856 (D. Mary. Mar. 13, 2023); *United States v. Bartucci*, --- F. Supp. 3d --, 2023 WL 2189530 (E.D. Cal. Feb. 23, 2023); *United States v. Simien*, --- F. Supp. 3d ---, 2023 WL 1980487 (W.D. Tex. Feb. 10, 2023); *United States v. Rowson*, 652 F. Supp. 3d 436 (S.D.N.Y. 2023); *United States v. Kays*, 624 F. Supp. 3d 1262 (W.D. Okla. 2022); *United States v. Now*, No. 22-CR-150, 2023 WL 2717517 (E.D. Wis. Mar. 15, 2023), *R&R adopted*, 2023 WL 2710340; *United States v. Stennerson*, No. 22-cr-0139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Gore*, No. 2:23-cr-04, 2023 WL 2141032 (S.D. Ohio Feb. 21, 2023); *United States v. Kelly*, No. 3:22-cr-0037, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022); *cf. United States v. Holden*, 70 F.4th 1015 (7th Cir. 2023); *but see, e.g.*, *United States v. Hicks*, 649 F. Supp. 3d 357 (W.D. Tex. 2023); *United States v. Stambaugh*, 641 F. Supp. 3d 1185 (W.D. Okla. 2022); *United States v. Quiroz*, 629 F. Supp. 3d 511 (W.D. Tex. 2022).

**B.     The Second Amendment's plain text covers Trevino's conduct.**

Trevino contends that the receipt of firearms is covered by the Second Amendment. (*See id.* at 10–16.) He states that "[t]he Second Amendment's operative clause contains three textual elements: it protects the right of (1) 'the people' to (2) 'keep and bear' (3) 'Arms.'" (*Id.* at 10–11.) He believes that he "satisfies all three elements." (*Id.* at 11.) Trevino contends that if the fact of

his indictment strips him of his right to bear arms under the Second Amendment, then it would similarly "deprive him of his First Amendment rights to speak about matters of public concern and worship according to his faith, and his Fourth Amendment right to be free from warrantless searches of his home." (*Id.* at 12.)

The Government disagrees and argues the Second Amendment "does not cover receiving guns while under felony indictment." (Doc. 55 at 6 (bolding omitted).) The Government emphasizes the *Bruen* decision's reference to "law-abiding" citizens and argues that the Second Amendment does not apply to individuals who are not law-abiding. (*See id.* at 9–13.) Moreover, the Government asserts, the fact of an indictment may indeed serve as grounds to restrict an individual's constitutional rights. (*See id.* at 23.) "For instance, the First Amendment protects the freedom of speech, yet released defendants may be requires to 'avoid all contact' with victims and potential witnesses." (*Id.* (citing 18 U.S.C. § 3142(c)(1)(B)(v)).) "The First Amendment also guarantees the freedom of association, yet defendants may be required to 'abide by specified restrictions on personal associations.'" (*Id.* (quoting 18 U.S.C. § 3142(c)(1)(B)(iv)).) The court in *Now*, examining the same argument, agreed that "[a]n information or indictment . . . significantly alters the status quo and may result in a myriad of restrictions on a person's constitutional rights." 2023 WL 2717517, at *5 (citation omitted). An indicted individual "may be incarcerated based solely on the conclusion that he is a danger to the community" or "because he lacks resources sufficient to allay the court's fears that he may flee." *Id.* (citing *United States v. Salerno*, 481 U.S. 739, 755 (1987)). An indicted individual may have his assets seized pending forfeiture, he "may be required to provide DNA samples," and he may face travel restrictions. *See id.* (citations omitted). (*See also* Doc. 55 at 23 (citing 18 U.S.C. § 3142(c)(1)(B)(iv)).)

Both Trevino and the Government offer well-reasoned arguments. Ultimately, however, courts across the country have weighed in on this issue and almost without exception have come down on Trevino's side. *See Jackson*, 2023 WL 2499856, at *8 ("of the few district courts that have specifically addressed the constitutionality of § 922(n) post-*Bruen*, they have all concluded that the plain text of the Second Amendment covers the conduct of individuals under indictment) (gathering cases); *Bartucci*, 2023 WL 2189530 at *5 ("none of the post-*Bruen* decisions that have analyzed the constitutionality of Section 922(n) have followed what the Government proposes") (gathering cases). In *Kays*, for example, the court noted that the Government's emphasis on a citizen's status as a person under indictment "ignores the Supreme Court's emphasis on an individual's conduct, rather than status, to decide if Second Amendment protection exists." 624 F. Supp. 3d at 1265.

Thus, the Court will not spill much ink on the issue and will, as other courts have, assume arguendo that Trevino "is among 'the people' to whom the Second Amendment applies, despite his status as an indictee." *See Jackson*, 2023 WL 2499856, at *9; *see also Now*, 2023 WL 2717517, at *5 (noting that although it "doubts that Now has sustained his burden to show that he is an 'ordinary law-abiding' citizen so as to come within 'the people' subject to protection of the Second Amendment[,]" it would presume otherwise for purposes of the motion and move to step two of the *Bruen* framework); *cf.*, *United States v. Rowson*, 652 F. Supp. 3d 436, 459 (S.D.N.Y. 2023) (noting that, "[w]ith limited exceptions, most [pre-*Bruen* decisions have] declined to hold that [different groups of people, e.g., immigrants or felons,] were categorically without Second Amendment rights") (citing, *e.g.*, *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) (assuming, without deciding, that illegal immigrants are within "the people")).

C.     **Section 922(n) is consistent with the United States' historical tradition of firearm regulation.**

Having found that Trevino's conduct fits within the ambit of the Second Amendment, the Court must determine whether the Government meets its burden at the second step of the *Bruen* framework to show that § 922(n) is "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2126. This step requires jurists to view regulations through a historical lens. *See id.* at 2131. *Bruen* does not mandate that the Government identify an *identical* 18-century regulation. *See id.* at 2133. Rather, the Supreme Court directs courts to "reason[] by analogy" to "determin[e] whether a historical regulation is a proper analogue for a . . . modern firearm regulation . . . . " *Id.* at 2132. This analysis should include a consideration of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

Here, the United States "acknowledges that [§] 922(n) lacks a 'historical *twin*[,]'" as it has identified no equivalent 18th century law. (Doc. 55 at 15 (quoting *Bruen*, 142 S. Ct. at 2133).) The Government contends it has, however, laid out three restrictions that it argues serve as "historical precursors." (*Id.*) These restrictions include: (1) laws detaining criminal defendants without bail that also served as restrictions on their right to keep and receive arms; (2) surety laws; and (3) laws that allowed individuals to be divested of their arms on arrest. (*Id.* at 15–21.) The Court will examine these restrictions below to analyze "how and why" § 922(n) and its alleged historical precursors burden Second Amendment Rights. *See Bruen*, 142 S. Ct. at 2132–33.

1.     **Why § 922(n) and related historical restrictions burden Second Amendment rights.**

The Government explains that our country has long "subjected criminal defendants to temporary restrictions on their liberty" to secure their attendance at trial and to "preserve 'the safety of the people' from offenders who are still awaiting trial." (Doc. 55 at 15 (quoting *A Digest*

*of the Doctrine of Bail in Civil and Criminal Cases* vii (1783)) (citing *Ex parte Milburn*, 9 Pet. 704, 710 (1835) (Story, J.)).) United States District Judge Kathleen Cardone, deciding a similar motion to dismiss, examined the Judiciary Act of 1789 and other sources and opined that § 922(n) and historical pretrial detention laws evidence enduring governmental goals related to the detention of individuals who "posed a risk of flight or a danger to the community." *Posada*, 2023 WL 3027877, at *3 (citations omitted); *see also Now*, 2023 WL 2717517, at *7 ("most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens'") (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010)). Other courts that have held § 922(n) withstands constitutional scrutiny post-*Bruen* have analogized § 922(n) to a broader set of colonial laws: those that "bespeak a 'public understanding of the [Second Amendment] right' in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness." *See, e.g.*, *Rowson*, 652 F. Supp. 3d at 466; *Jackson*, 2023 WL 2499856, at *12–13; *Bartucci*, 2023 WL 2189530, at *7.

>    **2.    How § 922(n) and related historical restrictions burden Second Amendment rights.**

The Government offers three types of allegedly analogous historical restrictions. (*See* Doc. 55 at 15–21.) The Court will consider them in turn.

<u>**Laws Detaining Criminal Defendants Without Bail**</u>

The Government first notes that historically, indictees charged with capital crimes were frequently denied bail. It explains that "at the time of the founding[,] . . . virtually all felonies were punishable by death." (Doc. 55 at 16 (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019); *Tennesee v. Garner*, 471 U.S. 1, 13 (1985)).) In fact, "the First Congress imposed capital punishment" even for non-violent crimes such as "'forgery of United States securities' and

'running away with a ship or vessel, or any goods or merchandise to the value of fifty dollars.'" (*Id.* (quoting *Harmelin v. Michigan*, 501 U.S. 957, 980–81 (1991)).) The States were no different, imposing the death penalty "for 'nonviolent crimes such as forgery and horse theft.'" (*Id.* (quoting *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)).)

The First Congress made a capital defendant's entitlement to bail dependent "on the strength of the prosecution's evidence against him." (*Id.* at 16–17 (citing Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 91).) "In determining whether the evidence was sufficiently strong to justify denying bail, courts accorded great weight to the grand jury's indictment." (*See id.*) The Government cites Chief Justice Marshall's decision in Aaron Burr's trial for treason to grant bail *before* indictment, and later to refuse bail *after* the indictment. (*See id.* (citing Thomas F. Davidson, *The Power of Courts to Let to Bail*, 24 Am. L. Reg. 1, 3 (1876)).) "At the bail hearing, Chief Justice Marshall 'doubted extremely' whether he had the power to grant bail 'after an indictment.'" (*Id.* (quoting David Robertson, *Reports of the Trials of Colonel Aaron Burr* 311 (1808)).)

The Government offers a litany of resources from the early to mid-1800s to establish "that, in early America, a defendant indicted for a serious (and hence capital) crime would *ordinarily* be held without bail." (*See id.* at 17–18.) The Government posits that the practice of holding criminal defendants without bail also logically operated to restrict their ability to receive or possess arms. (*See id.* at 19.) While Trevino did not file a reply brief, the Court's independent research reveals "[a]t least some scholarship indicates that, contrary to the Government's stance, pretrial release for defendants accused of felonies, as well as capital offenses, was 'routine' and a 'common pattern.'" *Posada*, 2023 WL 3027877, at *5 (citing Caleb Foote, *The Coming Constitutional Crisis in Bail: I*, 113 U. Pa. L. Rev. 959, 981–82 (1965)). Still, the Government's research provides some insight into the question.

11

**Surety Laws**

The Government next draws on historical surety laws as analogues for § 922(n). (*See* Doc. 55 at 19.) To be released on bail, a criminal defendant had to find a surety—a person who ensured the defendant would both attend trial and would "ke[ep] the peace' until trial." (*Id.* (quoting 4 Blackstone 250).) Should the defendant fail to do so, the surety "would forfeit a sum of money . . . ." (*See id.* (citing 3 Blackstone at 280; 4 Blackstone at 250).)

"To enable sureties to fulfill their functions, the common law granted them legal custody of the bailed defendant." (*Id.*) Lord Chief Justice Hale stated, "he that is bailed, is in supposition of law still in custody, and the parties that take him to bail are in law his keepers." (*Id.* (quoting 2 Matthew Hale, *The History of the Pleas of the Crown* 124 (1736)).) The Supreme Court observed "that a bailed defendant 'is regarded as delivered to the custody of his sureties,' whose 'dominion is a continuance of the original imprisonment.'" (*Id.* (quoting *Taylor v. Taintor*, 83 U.S. 366, 371 (1873)).) Sureties had "unrestricted authority" over bailed defendants, and could seize and deliver a defendant to the court at any time. (*See id.* (quoting Charles Petersdorff, *A Practical Treatise on the Law of Bail in Civil and Criminal Proceedings* 514 (1824)) (discussing *Taylor*, 83 U.S. at 371).) Sureties were allowed to restrict a defendant's movement, even imprisoning him at will. (*See id.* (discussing *Taylor*, 83 U.S. at 371; 2 William Hawkins, *A Treatise of the Pleas of the Crown* ch. 15, § 84 at 178 (6th ed. 1787)).)

Even more fitting are surety laws that put specific restrictions on the right to bear arms. The *Kays* court, for example, analogized § 922(n) to an 1836 Massachusetts law that "required any person who was reasonably likely to breach the peace . . . to post a bond before publicly carrying a firearm." 624 F. Supp. 3d at 1268 (quoting *Bruen*, 142 S. Ct. at 2148). "From 1838 to 1871, 'nine other jurisdictions adopted variants of the Massachusetts law.'" *Id.* (quoting *Bruen*, 142 S. Ct. at

2148). The *Kays* court opined that "§ 922(n) is arguably less restrictive than the surety laws[, which] . . . required those 'reasonably accused' to 'show a special need in order to avoid posting a bond' before carrying" a firearm. 624 F. Supp. 3d at 1268 (quoting *Bruen*, 142 S. Ct. at 2149). "Section 922(n) does not prevent an individual from publicly carrying; it simply limits an individual's right to receive a firearm during the pendency of an indictment." *See id.* In fact, most courts that have upheld § 922(n) post-*Bruen* have found that these surety laws provide a sufficient historical analogue. *See, e.g., id.* at 1267–68 (relying on surety laws as the sole historical analogue to uphold § 922(n)); *Gore*, 2023 WL 2141032, at *4 (same); *Simien*, 2023 WL 198770487, at *7 (same); *Rowson*, 652 F. Supp. 3d at 465–72 (relying on surety laws and laws that disarmed persons deemed dangerous to uphold § 922(n)); *Bartucci*, 2023 WL 2189530, at *7–10 (same); *Jackson*, 2023 WL 2499856, at *12–14 (same); *Now*, 2023 WL 2717517, at *7–8 (same).

The Court agrees that surety laws—both those that required sureties to exercise authority over criminal defendants to ensure that they appeared for court and kept the peace until trial and those that restricted individuals' right to carry firearms—are sufficiently analogous to § 922(n) "to pass constitutional muster." *See Bruen*, 142 S. Ct. at 2133. Both § 922(n) and the relevant surety laws "presume[] that all individuals have a right to keep and carry firearms but impose[] a burden on that right for a limited time upon a finding by a judicial officer or other legal process that an individual has participated in dangerous, disruptive, or otherwise felonious conduct." *See Gore*, 2023 WL 2141032, at *4.

## Laws that Divested Individuals of Their Arms on Arrest

The Government finally notes "[t]he common law has long allowed the arresting officer to seize, among other things, a suspect's 'weapons,' lest the suspect use them to 'effect an escape from custody.'" (Doc. 55 at 20 (quoting *Agnello v. United States*, 269 U.S. 20, 30 (1925)).) This

"power was 'always recognized under English and American law' and was 'uniformly maintained in many cases.'" (*Id.* (quoting *Weeks v. United States*, 232 U.S. 383, 392 (1914)).) While it is true that arresting officers have long held the authority to disarm arrestees, this is somewhat inapposite to § 922(n), which prohibits the *receipt* of firearms by indictees and says nothing of firearms they might already possess.

## IV.    Conclusion

"To be an appropriate analogue to § 922(n), a historical regulation must 'impose a comparable burden on the right of armed self-defense' and that burden must be 'comparably justified.'" *Gore*, 2023 WL 2141032, at *4 (quoting *Bruen*, 142 S. Ct. at 2132). Here, the Government demonstrates that our country has historically imposed restrictions on felony indictees' rights, including restrictions on the right to possess arms via surety laws. We impose these burdens both to ensure defendants' presence at trial and to preserve the safety of our communities. Accordingly, the Court holds § 922(n) does not, on its face, violate the Second Amendment.

Trevino does not develop any argument to establish that § 922(n) is unconstitutional as applied to him and has, therefore, waived the argument.[4] (*See* Doc. 51.)

**THEREFORE,**

**IT IS ORDERED** that Trevino's Motion to Dismiss (Doc. 51) is **DENIED**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE

---

[4] To the extent Trevino intends to argue that § 922(n) is unconstitutional as applied to him because he was on deferred adjudication, the Court would disagree. *See Simien*, 2023 WL 198770487, at *7 (finding that a felony indictee who was on deferred adjudication "fail[ed] to raise an actionable as-applied challenge to § 922(n)").